The argument is 13-15-74, Xinjiang Native Produce v. U.S. What's your view of the endgame here? I was a little puzzled. Is it your view that because of the existence of the suspension agreement, that a dumping order is of no force and effect? Well, Your Honor, we've tried to be very careful not to state that this is what we believe this court should do, is make a determination with respect to what the agency should do. It looked to me like what you want to do is to upset the anti-dumping order, not just for the six-month overlap period, but like forever. Is the anti-dumping order still in effect? What we would like, Your Honor— Is the anti-dumping order still in effect? We believe personally that with the proper application of the law, as interpreted by this court, the agency now has an obligation to go back and reconsider the facts and evidence that it has before it with the proper application of the law. Is the anti-dumping order still in effect? Our belief is that if they accept the law as interpreted by this court— Can you answer my question? Is the anti-dumping order still in effect? It would not be. Is it still in effect today? That's my question. Is it in effect today? I'm sorry. Yes, Your Honor. As we speak today, yes. And it's in effect as to your client and as to everybody else, right? As to everybody else. That's correct, Your Honor. That's correct. What facts would they need to consider on the remand? It strikes me that you've argued that the agreement establishes the fact that there's no dumping. And the anti-dumping order we're dealing with here covers part of the period of the agreement. So what's left on the remand? Well, one of the major concerns, Your Honor, is that when this anti-dumping petition was initially filed, it was alleging that there was dumping occurring at a time in which it is undisputed that 100 percent— I understand, but you're not answering my question. My question is, you say there should be a remand to have them reconsider the dumping. What's left to reconsider? Wait. If we were to agree with your position, what's left to reconsider? Because before the agency can initiate an anti-dumping investigation in the first place, it is required, pursuant to the statute, to consider the evidence that has been provided in the petition itself. I don't understand what you're saying. I really don't. I mean, your position is that because of the agreement, there couldn't be any dumping. So why doesn't that mean that the dumping order can't be applied to you? Because, Your Honor, when the initial petition was filed, the agency, Commerce, was required to make a decision. You don't seem to understand my question. In response to Judge Clevenger, you said, he asked you what kind of relief you wanted. He said he wanted a remand to have them reconsider the dumping question. What's to reconsider? If we agree with you, there isn't any dumping, right? If this Court agrees with us, ultimately, yes, we believe that that is the case. But why is that necessarily so? I mean, you're assuming that a suspension agreement supplants or makes impossible a lawful dumping order. What happens about a suspension agreement that was designed to eliminate dumping, but it failed? Well, Your Honor, as... It failed. And that's apparently what happened here. Well, as... According to your view, and the Court's view, that this dumping order may have been, you know, that the suspension agreement was designed to end dumping. But we know it didn't. Because we know that for the six-month overlap period at least, when the facts were assessed under the normal assessment to decide whether there's dumping, dumping was found. And you do not contest those findings. You agree now with those findings in the anti-dumping investigation that dumping was proved to have happened in the traditional way. That means of necessity that the purpose of the original suspension agreement, which was to prohibit the same, it failed. Your Honor, in the 2005 opinion, this Court specifically noted the argument that you state now. And it noted that the government did not argue that the suspension agreement had failed. It said, to the contrary, the government takes the position...  I mean, if you were to go back, and if you really wanted to reopen the dumping order, go back and say, well, what's the relationship... What's the relationship between the suspension agreement and the anti-dumping order? And the answer is the suspension agreement failed. It failed to stop dumping. Because we've proved, and you can't re-litigate the guts of the anti-dumping investigations where it's judicatic, because it's been done. And so we know, as a matter of, just a matter of logic, that the purpose of the suspension agreement, it failed to achieve its purpose. Well, Your Honor, again, a finding of dumping, particularly in a non-market economy case such as we have with China, is not a black or white finding. It is a finding that the agency reaches through a number of... But all of that whole process of looking at India and finding surrogates and all that, that was hotly contested whether that was done right or wrong. You appealed that. It went back a couple of times. Finally, it was settled at the CIT, this is legit. Here are the dumping margins. And you've never appealed it. Your Honor, we did not appeal that issue. That is correct. However, it is very clear that the trial court's decision with respect to that claim was predicated on its belief that the suspension agreement, as a matter of law, was not designed to eliminate dumping. This court... So what if it was? I mean, purposes and international agreements fail all the time. And that suspension agreement was just in the nature of a State Department international agreement type thing. How do we know how Commerce came up with the terms and conditions of the suspension agreement? What, 82% of somebody else's prices? I would say... The hope was that it would stop dumping, but it didn't. Well, again, Your Honor, in the 2005 opinion, this court recognized that the government could have made that argument and the government has not. What we do have is very clearly a situation in which the trial court's decision with respect to that issue of whether or not the dumping decision itself is valid was predicated on a legal finding, a legal finding that rejected our argument. Where in the opinion did this court say that? You say we dealt with this issue, which Judge Clevenger has raised with you. That is, that the design and the effect of the agreement are not necessarily the same. Where in the opinion did we address that? You're speaking of the 2005 opinion, Your Honor? Yes. This, Your Honor, would be, I believe, midway... What page? Midway between page 13, 67, and 68 of the... Oh, I'm sorry, from the joint appendix, Your Honor? Yes, the attachment to the blue brief. Well, Your Honor, this specific opinion that was attached to the brief... Oh, okay, I'm sorry, all right. The ultimate opinion of the court... Where is it, 13, 67, you say? Yes, yes, sir. Yes, sir. Where? The paragraph begins, the government does not argue that the suspension agreement failed to comply with the statute. Rather... The suspension agreement, right. Correct. The government does not argue that the suspension agreement failed to comply with the statute. This, Your Honor, is, as I take it, the question you are asking, is why can't we simply say... No, that paragraph... Oh, go ahead. ...that the suspension agreement was not designed to eliminate dumping. That's correct. That's in terms of what it was designed to do, not what it actually accomplished. Well, yes, Your Honor, but I was responding to a question that Judge Clevenger had asked earlier about why couldn't we just simply say, this was the intended effect of the suspension agreement, but it failed. And my point was simply... No, the fact that the government didn't argue it failed to comply with the statute, the suspension agreement was created according to the statute. Nobody objected to that. And you know as well as I do that the suspension agreement was under paragraph L, right. And so the point here is that even if the suspension agreement had been, you know, actually designed to eliminate dumping, there's nothing that says it has to do the job. And the purpose of something is to do something you wish and you hope it to be true, right. And so the fact that the government agreed that the suspension agreement was legitimate doesn't mean that it's going to succeed. It just means that it's legitimate in its purpose. That's all. I understand, Your Honor. As I say, it doesn't take a law school graduate to realize that the purpose of the suspension agreement, if it was to end dumping in that six-month period, it failed. Because we know that dumping occurred in that six-month period. We know that commerce determined that there was dumping. And you did not appeal that determination. We did not appeal that determination, Your Honor. However, the Court of International Trade ruled against us on that issue, making a legal ruling that was explicitly contrary to the subsequent ruling on this exact point of law, which this Court made. But I think the point is it's not directly contrary to the ruling that this Court made. The ruling that this Court made is that the agreement is designed to eliminate dumping, not that it did eliminate dumping during the six-month period that we're talking about here. So even if we were to accept your proposition that the statements in the earlier opinion are binding on the trial court, it doesn't resolve the question. It's not the same question. Right? Well, Your Honor, the statement which this Court issued in 2005 was the Court of International Trade erred in holding that the suspension agreement was not designed to eliminate dumping. It's designed, but it doesn't achieve it. So to come back to my question, what do you want to happen here? You want the trial court to consider the fact that the agreement was designed to eliminate dumping. I'm not sure what effect would that have on the dumping determination. Well, Your Honor, the court, this court recognized in 2005 that the trial court's holding was predicated on this finding, and this court specifically noted legal error. Yeah, but we're saying the same thing, but we're not connecting here. What the finding was that they erred in holding that it was not designed to eliminate dumping. And I think Judge Clevenger and Judge Dyke and I have all said to you, well, yeah, okay, let's accept that as given. And that led to their saying that you couldn't have known or should have known, and that goes to the extraordinary circumstance, the critical circumstances finding. But that has nothing necessarily to do with any conclusion with regard to the dumping itself during the suspension period. Well, Your Honor, with respect, we would say it does, because the trial court's decision with respect to that issue was clearly predicated on the exact same legal position, which this court then found to be in error. Where do you dig that out of the trial courts? You're talking about the November 21, 2003 opinion? Correct, Your Honor. Where then? My apologies, Your Honor. Just one moment. Your Honor, as we quote extensively in our direct brief, the trial court specifically addressed all arguments with respect to our claims regarding the dumping calculation. If you look at page 1838, I'm looking at it in law week, in Westlaw, they say they don't agree with your argument that sales can't be at less than fair market value if a suspension agreement was in place. Nothing in the statutes tell you to do that. The Court of National Trade said we don't see any inconsistency between having a suspension agreement out there and at the same time having a proper anti-dumping order. That's correct, Your Honor. And we view this as a finding by the trial court, which was predicated on this view that it was not the legal effect or purpose of the suspension agreement to eliminate dumping. And that is a finding in law which this court directly reversed and which the trial court subsequently refused to accept in its further proceedings. We believe that that is the legal error here which we are seeking to be corrected. Why don't we hear from the government? Thank you, Your Honor. May it please the Court? Just a note, the government again has given us a brief with two-sided copying. We've had a number of cases recently where it pointed out to you that that's not permissible under the Federal Rules of Appellate Procedure and you keep doing it. Yes, Your Honor. We'll be sure not to do that in the future. I apologize. Xijing seeks to circumvent the mandate rule and the fact that it failed to appeal the license or value determination in its first appeal. It argues that this court issued a legal ruling on the purpose of the suspension agreement that was binding on the trial court. But Xijing fails to demonstrate how this court's statement regarding the design of the suspension agreement has an impact on Commerce's less than fair value determination. The statute and regulations are clear. It requires Commerce to calculate dumping margins by comparing the export price or the price that the merchandise is sold in the United States against normal value. And for non-market economy countries such as China, the statute directs Commerce to calculate normal value using the factors of production methodology, which is precisely what Commerce did here. Well, are you saying that – let's assume that the first decision this court established is that these agreements are designed to prevent dumping. Are you saying that that would be irrelevant to an actual dumping determination, or would that still be a relevant factor in that determination? That is an entirely irrelevant factor in Commerce's dumping calculation. Whether a suspension agreement is designed to eliminate dumping has no consideration by Commerce in its dumping calculations. The statute and regulations don't permit Commerce to consider the existence of a suspension agreement. It sets forth a particular methodology that Commerce must use in calculating dumping margins, which is what Commerce did here, and which is why the Court of International Trade sustained Commerce's less than fair value determination. Xijing argues that the trial court's decision was predicated on the fact that it believed that the suspension agreement was not designed to eliminate dumping. But that's simply not the substantial portion of the trial court's case. The trial court merely was addressing Xijing's own argument that the suspension agreement was designed to eliminate dumping. But, in fact, the critical analysis by the trial court regarding Commerce's less than fair value determination – What's the status of a suspension agreement? Is it like a treaty? What's the status in the law of a suspension agreement? Do you know? I don't think I understand your question. Well, what I'm trying to ask is what's the enforceability of a settlement agreement? The enforceability? It's an agreement between whom? Between the Chinese government? Yes. The Chinese government and the United States government? Yes. And duly authorized Secretary of Commerce is allowed to sign it? Yes. And then the parties, interested parties, all take part in providing comments. And they found out there are limits to how many – the Chinese were limited to a certain amount of imports and a certain amount of prices. And the facts here show the Chinese were in full compliance during – I'm not talking about the six-month overlap period. Right. The consequences here are odd because you have a six-month overlap period when the parties were in compliance with the suspension agreement, and yet they would be deemed to be in violation of the dumping, right? So my question is, can the United States government collect anti-dumping duty from a party who is in compliance with a settlement agreement? Yes. Why? Because the purpose of a suspension agreement is entirely different than what actually happens pursuant to the suspension agreement, just because we didn't argue that there were violations of a settlement agreement. If the Chinese had violated either the pricing or the quantity limit on the imports, what would have been the consequences? Consequence is – well, it depends on whether an interested party raises a violation. Well, let's assume somebody did. Let's assume we go back, forget about the dumping agreement for a moment, and just take the suspension agreement. Say the Chinese – they violated both the volume limit and the pricing limit. What are the consequences? Well, I think – I believe the statute requires the suspension be lifted, and then they would continue the investigation. And I think that's pursuant to 19 U.S.C. Section 1673. See? So those are the penalties. Yeah. But if there's an agreement – and I know you've disputed that about this agreement – but if there is an agreement that's designed to prevent dumping during the period of the agreement, as a matter of practice, does Commerce ever assert dumping in those situations? Well, see, the facts are a little different because suspension agreements that are designed to eliminate dumping, they contain language within the agreement saying – referring to the normal value, which is what Commerce calculates, uses in its calculations for its dumping margins. But the suspension agreement at issue here didn't contain those words. It didn't – the reference price wasn't based on normal value. So is the answer that in a normal situation where there is a suspension agreement, that that precludes a dumping finding? No, it doesn't. It very well could be that nobody alleged a violation of this Subsection B agreement. Well, suppose somebody did allege a violation of that Subsection B agreement. What would Commerce do? Well, it would terminate the agreement and would continue the investigation. Suppose there was an allegation that there was dumping but compliance with the agreement. Well, that violation – Commerce ultimately determined that – Well, let's say that we have a standard suspension agreement under B, and you say that has normal value calculations in it.  And there's compliance with that agreement. Would Commerce ever go after the importer under those circumstances who complied with the agreement and alleged that despite the compliance with the agreement there was still dumping? Well, it would have to investigate and actually determine whether – Yeah, but has Commerce ever done that? I don't know. Seems kind of unlikely. Probably, but I can't say for sure. It seems unlikely. Isn't it really the government's position earlier that the elephant in the room was that our court made a mistake in the earlier decision? Isn't the agreement in this – the suspension agreement in this case is a Subsection L agreement for non-marketing economies? That's what we believe. Well, isn't that – I read the suspension agreement. It says we're pursuant to L. Yes. That's our position, whether – And L doesn't – L, the purpose of L is not to completely eliminate sales at less than fair value? That's our understanding of the agreement at issue. This court has no further questions. I respectfully request that this court affirms. Thank you. Good morning, Your Honors. Michael Corsi IV, appellant to the Domestic Producers of Honey, Sioux Honey Association, American Honey Producers Association. Perhaps I can shed some light on your question, Judge. The suspension agreement had a pricing component that allowed the Chinese to price at 92 percent of third-country imports over the five-year period. Start of the five-year period, prices led throughout by Argentina were very high. Argentinian prices crashed and brought prices way down low. By the time the suspension agreement was toward the end of its five-year term, the domestic industry saw it was not doing what it was supposed to do. It was not preventing, even if you assume it was to prevent dumping. That was not happening. They waited for it to expire by its terms and then filed a new petition for a new investigation. Okay, that's helpful, but what's the answer to the other question? If this were a B agreement, does Commerce ever assert dumping where there's compliance with a B agreement? Your Honor, those agreements are very rare. They do not – and so I do not know of an occasion where that has happened. Here, in our case, you have the perfect example of where even assuming the agreement was intended to prevent dumping, it didn't. Manifestly, it didn't, and this is in Judge Eaton's many decisions. You can find his – he explains it quite clearly how this happened. So even if you have this agreement being to prevent dumping or to eliminate dumping, it clearly didn't. This case, I guess I wanted to present – do I have another question, Your Honor? Go ahead. I first wanted to point out that Mr. Pardo, I don't think, really answered your question about what do you want – what does he want you to do. You need to turn to page 25 of their opening brief. Here's what they want. They are claiming that Judge Eaton below erred in his remand instructions to Commerce. He said that – the brief says the CIT should have instructed Commerce to conduct further proceedings on remand in accordance with this court's holding that the purpose of the suspension agreement was to avoid dumping. And this is the important part, that according to this provision on suspension agreements, any subject merchandise sold at prices in compliance with the suspension agreement could not, as a matter of law, have been dumped. This is basically taking a dicta statement from this opinion. I don't think it was dicta. Well, even if it's not dicta, Your Honor, I guess the point I would make here is they are taking – they have the opportunity to appeal the dumping determination. If you look at Judge Eaton's original decision, it's 31 pages. Ten pages of those are dedicated to the dumping decision. Well, your adversary has admitted that he did not directly appeal the question that he's bringing to us right now. He's arguing that it was implicit somehow. He thinks implicit in his appeal, and he says, even if it wasn't in my appeal, it was a gift from heaven. The court's opinion is like Zeus shot an arrow right now, and it was designed to go right into Eaton's heart. Judge Eaton hears the thunderbolt. This is where it breaks down, Your Honor, and I think you've already hit on it in keying on this language from Judge Eaton. Those ten pages of analysis – Judge Eaton did make decisions. He did say that the suspension – that the dumping law has all kinds of provisions. He went through them, over 12 separate provisions, ten cases he cited in going through this. That's how you calculate dumping margins, and nowhere could he find any place to say you have to take into account a suspension agreement. Now, that is what he held. What they're not filing their appeal did is it deprived the government and us and you of the opportunity to air these arguments openly in court. This is an end run around this whole process, around these ten pages of his decision. Everybody's getting a ton of due process today, I see, running over time. Your Honor, I – basically… You may argue the government cut into your due process time, but it's fair to hear it. Your Honor, I think this is – the case law is clear. Parties have to live with the consequences of their making a decision not to appeal. They have 14 plaintiffs here, five of them are exporters, importers. They went after the smallest, most insignificant issue that would not, when lost, destroy the order. They decided to go against it, and that decision, who knows why they made it. But they made it. Now they want to come back and destroy the order. I think we have your argument. Thank you. Thank you. Mr. Cardo, we'll restore a couple minutes of your time. Thank you, Your Honor. For the record, Judge Clevenger, I do not wish that Zeus or anyone else shoot an arrow through Judge Eaton's heart. I have full respect. It was a figure of speech. I'm relieved for that clarification. At the conclusion of this court's initial opinion, when this case was then remanded back to the trial court, the trial court at that point had, within its own authority, the discretion to revisit any issue or legal finding that it wished at that point. Why should it revisit? If the only holding was that the agreement was designed to eliminate dumping, why would that cause someone to reexamine the dumping determination? Again, Your Honor, because we believe that a large part of the decision which Judge Eaton had made previously was predicated on his view on a legal issue that was directly contrary to what this court had stated. I understand that he discussed that. But what I'm asking you is why, if the agreement was designed to eliminate dumping, why does that help you in setting aside the dumping determination? Because it is clear that not only the trial court but the agency below held an erroneous view as to what the legal effect of the suspension agreement was. Therefore, it is the duty of the court to correct the legal error and remand the case back to the agency to afford the agency an opportunity to reconsider the facts with the proper application of the law. And this is what has not happened in this case. There is a clear indication that both the trial court and the agency made findings and determinations with an erroneous view of the law as interpreted by this court. We merely seek for this court to issue an instruction to the trial court to fulfill its obligation to apply the law as interpreted by this court. Thank you.